J-S39002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRICHETT KING | : | |
| | : | |
| Appellant | : | No. 2349 EDA 2024 |

Appeal from the Judgment of Sentence Entered August 8, 2024
In the Court of Common Pleas of Delaware County
Criminal Division at No:  CP-23-CR-0004820-2023

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 26, 2026**

Appellant, Brichett King, seeks review of the judgment of sentence entered by the Court of Common Pleas of Delaware County (trial court), following a jury trial.  This case arose from a 2023 incident in which Appellant fatally shot his uncle, James Ford (the victim).  Appellant was charged with several offenses in connection with that death, and was found guilty of one count of voluntary manslaughter.  The trial court sentenced him to a prison term of 5.5 to 11 years.  Appellant now argues that the judgment of sentence must be vacated because the Commonwealth failed to disprove his claim of justifiable self-defense; the evidence of guilt was legally insufficient; and a missing witness instruction was erroneously denied.  We affirm.

The underlying facts of this case are not in dispute.  On August 17, 2023, Appellant was working as a mechanic at ATP Motors, an auto repair shop.  The victim drove to the auto shop at about 4:30 p.m. that day to have his vehicle's

oil changed. As Appellant began working on the victim's vehicle, the two began arguing about whether Appellant had damaged its sideboard with a jack. They continued arguing even as Appellant completed the oil change and walked into the garage of the auto shop.

The victim followed Appellant into the garage of the auto shop, and soon after he did so, Appellant quickly turned around and shot him three times with a firearm. Appellant then ran to another customer's vehicle near the garage, removed the license plate from the vehicle, and drove away in it. The victim ran to a nearby river and collapsed on the ground. By the time police arrived, the victim had already succumbed to his injuries.

During their investigation, detectives recovered surveillance video footage of much of the incident. The trial court described the surveillance footage as follows:

> [T]he video from the side of the ATP Building (C-4) shows [Appellant] and [the victim] on the property, with the victim's [vehicle] visible on the right side of the screen beginning at 8/17/23, 16:28:05 on the time counter. [Appellant] is seen moving about, going in and out of the garage, which is toward the left side of the screen, while he is performing the oil change as testified. Over the next [12] minutes, [the victim] and [Appellant] are seen on and off visibly moving their arms and speaking to each other in very animated manners, suggesting there was some on-going disagreement between them.

> At 8/17/23, 16:40:42 . . . , [Appellant] is clearly seen turning his back on the victim who is from him over [10] feet away. One . . . second later, at 16:40:43, [Appellant] leaves the video's view as he enters the garage with [the victim] moving in the direction of

- 2 -

the garage following [Appellant]. At 16:40:46, the victim leaves the view of the video as he enters the garage.

At 8/17/23, 16:40:47, on video C-5, from inside the building, [Appellant] is observed entering the garage and immediately turning around and shooting a gun in the direction from which he had entered, which is in the direct of the victim, who was at a distance following him into the garage. [Appellant's] actions in turning around and shooting are fluid and simultaneous. Several shots are seen being fired between 16:40:47 and 16:40:49, with [Appellant] then going back out of the garage in the same direction he was shooting. The victim is not visible on this video.

At 8/17/23, 16:40:50, . . . [the victim] is seen exiting the garage and running toward the ATP building's rear. [Appellant] is observed leaving the garage at 16:40:51, as the victim's son (Samage Ford) is seen approaching from the right side where the [the victim's vehicle] was situated. After interacting with [Appellant], who is visibly still holding a gun, the victim's son (Samage Ford), is mo[m]entarily observed running toward where his father fled, shown at 16:41:03. At 16:41:09, [Appellant] leaves the view of the camera, to the right toward the front of the ATP building, then returns briefly at 16:41:15. At 16:41:19, [Appellant] moves beyond the camera's . . . view.

At 16:41:19, [Appellant] is [shown] . . . walking from the side of the building to the front and calmly getting into an SUV, then driving away.

Trial Court 1925(a) Opinion, at 33-34 (internal citations omitted).

Days after the shooting, Appellant turned himself in. He was charged with several offenses in connection with the victim's death, including first-degree murder. Defense counsel requested, and was granted, a jury charge on justified self-defense and "imperfect" self-defense. Appellant asserted that he shot the victim while holding a reasonable belief that deadly force was necessary to avoid an imminent threat of deadly force from the victim, making

him innocent of murder, and guilty of, at most, voluntary manslaughter if his belief in the need for deadly force were found to be unreasonable.

At trial, Appellant took the stand on his own behalf to testify in support of his self-defense claim. According to Appellant, he and the victim (his uncle) were best friends, and on the day of the shooting, the victim grew hostile and irrational, believing Appellant had damaged his vehicle. Appellant repeatedly told the victim to go home, and when Appellant tried to walk away to the auto shop's garage, he heard the victim making threats of violence.

On direct examination, Appellant testified that he opened fire on the victim upon hearing the sound of a gun being "racked," and believing that the victim was about to shoot him, Appellant preemptively shot the victim three times in rapid succession. *See id*., at 182. It was only after Appellant had discharged his own weapon that he saw the victim holding a firearm:

> And once I heard that, you know, well -- yes. Once I heard that [racking sound], I immediately just thought about death and I just -- I immediately turned around to the sound of that noise and I fired three rounds. When I fired the rounds -- when I finally turned around in his direction, he was still -- he was facing me and I fired three rounds. And in the midst of me firing the rounds, he immediately turned away with the gun in his hand positioning to run out like this.

*Id*., at 180.

On cross-examination, the Commonwealth confronted Appellant with an audio recording of a phone call he had made with the car shop's owner, Leon Booker, in which Appellant told Booker he saw the victim lifting his shirt, but failed to mention ever seeing a gun or hearing the sound of a gun being racked

- 4 -

by the victim. *See id*., at 210-17. Appellant stated in response, and inconsistently with his testimony on direct examination, that he saw the victim with a firearm when he raised his shirt, just prior to hearing the racking sound:

> [Commonwealth]: When you were going into the garage, you would see him lift the shirt, you saw he had a firearm on --
>
> [Appellant]: Right.

*Id*., at 222. Moments later, Appellant again changed his account, stating that at the time he heard the racking sound, he could see "out of the corner of [his] eye," that the victim was "lifting his shirt." *Id*., at 223. But at that point, Appellant testified that he was still "[n]ot sure whether or not he had the gun[.]" *Id*.

Other than Appellant's testimony, there was no evidence that the victim possessed a firearm during their altercation. The video surveillance footage of the incident did not indicate that the victim ever carried a weapon or brandished one to Appellant. Detectives searched the area and found no weapon near the victim's body or elsewhere in and around the auto shop. The jury ultimately found Appellant not guilty of murder, but guilty of voluntary manslaughter, and the trial court sentenced him as outlined above.

Appellant timely appealed, and in his brief, he now raises three issues for our consideration:

> 1. Whether the Commonwealth failed to prove beyond a reasonable doubt that Appellant did not act in justifiable self-defense when he reasonably believed that he was in danger of death or serious bodily injury such that deadly force was necessary[.]

2. Whether the evidence was insufficient to establish Appellant's guilt for the offense of Voluntary Manslaughter, 18 Pa.C.S. § 2503 (b), where the Commonwealth failed to prove beyond a reasonable doubt that Appellant did not believe that he was in actual danger of death or serious bodily injury or that he unreasonably believed that he was in actual danger of death or serious bodily injury[.]

3. Whether the trial court erred when it denied Appellant's request for a missing witness jury instruction when the Commonwealth not only failed to subpoena a material witness, Leon Booker, but told the witness he was not needed for trial, resulting in the witness absenting himself at the time of trial thereby making him unavailable to the defense[.]

Appellant's Brief, at 3 (suggested answers omitted).

Appellant's first claim is that the Commonwealth failed to prove beyond a reasonable doubt that his use of deadly force was justified by the threat of death or serious bodily injury.

"Self-defense is a complete defense to a homicide charge[.]" ***Commonwealth v. Jones***, 271 A.3d 452, 458 (Pa. Super. 2021). A person is authorized to use deadly force in self-defense when certain statutorily enumerated conditions are met:

**(a) Use of force justifiable for protection of the person.--**

The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.**—

\* \* \* \*

(2) **The use of deadly force is not justifiable under this section unless the actor believes that such force is**

**necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if**:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

\* \* \* \*

(2.3) **An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:**

(i) the actor has a right to be in the place where he was attacked;

(ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and

**(iii) the person against whom the force is used displays or otherwise uses:**

**(A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or**

**(B) any other weapon readily or apparently capable of lethal use.**

18 Pa.C.S.A. § 505 (emphasis added).

- 7 -

"When the defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving such a defense beyond a reasonable doubt." *Commonwealth v. Rivera*, 983 A.2d 1211, 1221 (Pa. 2009). "[T]he Commonwealth cannot sustain its burden of proof solely on the factfinder's disbelief of the defendant's testimony. The 'disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact.'" *Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001) (quoting *Commonwealth v. Graham*, 596 A.2d 117, 118 (Pa. 1991)).

The Commonwealth may carry its burden of disproving a self-defense claim by establishing at least one of three facts beyond a reasonable doubt:

> 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety.

*Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (quoting *Commonwealth v. Hammond*, 953, 559 (Pa. Super. 2008)).

Relevant factors for determining the reasonableness of a self-defense claim include:

> whether complainant was armed, any actual physical contact, size and strength disparities between the parties, prior dealings between the parties, threatening or menacing actions on the part of complainant, and general circumstances surrounding the incident[.]

*Id*. at 788 (internal quotations and citations omitted).

Crucially, evidence that the victim was unarmed can be used to show that a defendant's use of deadly force was unreasonable and therefore unjustified. **See Jones**, 271 A.3d at 460 (finding that claim of self-defense was negated in part because "[n]o weapon of any kind was found on Victim and no witness saw any weapon on Victim.").

When considering the sufficiency of evidence which disproves a self-defense claim, our standard of review is to determine whether, "viewing all evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder" to find that a self-defense claim has been disproven beyond a reasonable doubt. **See id**. at 457-60 (citations omitted). The fact-finder is "free to believe all, part or none of the evidence." **Id**. (citations omitted); **see also Rivera**, 983 A.2d at 1221 (self-defense claim must be disproved beyond a reasonable doubt); **Torres**, 766 A.2d at 345 (disproving a self-defense claim requires something more than mere disbelief in a defendant's testimony).

In the present case, Appellant has argued that the Commonwealth failed to carry its burden of proving that his belief in the necessity of deadly force against the victim was unreasonable. We find, however, that viewed in the light most favorable to the Commonwealth, the evidence was sufficient to disprove that theory of self-defense.

At trial, Appellant testified inconsistently as to how the shooting unfolded and when he initially believed the victim was about to use deadly

force. Appellant first testified that he heard a gun "racking" behind him, and quickly turned around to shoot the victim three times. *See* N.T. Trial, 5/14/2024, at 180-81. On cross-examination, Appellant admitted that he did not mention the sound of a gun racking when recounting what had transpired in a phone call he made just one hour after the shooting had occurred. *See id*. at 210-12. He instead stated that he knew the victim was armed *prior* to the racking sound because he saw the victim lift his shirt to reveal a firearm in his waistband. *See id*. at 222. The jury was permitted to disbelieve Appellant's testimony, especially where it contained such material inconsistencies.

Moreover, video surveillance footage of the incident shows that the victim and Appellant were arguing as Appellant walked to the garage of the auto shop. Contrary to Appellant's account, the video recording of the incident did not at all indicate that the victim was either armed or threatening harm to Appellant. The victim's lack of a weapon was partly corroborated by searches of the area by investigating detectives, who found no firearms on the victim's person or elsewhere in the area where he was shot.

Finally, Appellant's conduct after the shooting arguably showed consciousness of guilt, and knowledge that his use of deadly force was unreasonable. *See*, *e.g.*, *Commonwealth v. Hughes*, 865 A.2d 761, 792 (Pa. 2004) (conduct of defendant after crime may be admitted "to show guilt"); *Commonwealth v. Bradley*, 69 A.3d 253, 258-59 (Pa. Super.

2013) ("[D]efendant's attempts to cover up after a crime can be inferred to demonstrate a consciousness of guilt."). Rather than remain at the auto shop and wait for police to arrive, Appellant immediately fled the area in a customer's vehicle, only doing so after removing the vehicle's license plate.

Thus, in addition to Appellant's conflicting testimony (which the jury was permitted to disbelieve), there was other evidence negating self-defense which was sufficient to support the jury's verdict.

Appellant's second claim is that the evidence of voluntary manslaughter was legally insufficient because the Commonwealth failed to prove beyond a reasonable doubt that he did not believe he was in actual danger of death or serious bodily injury, or that he unreasonably believed that he was in actual danger of death or serious bodily injury.

The offense of voluntary Manslaughter is defined as follows:

(b) Unreasonable belief killing justifiable. – A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

18. Pa.C.S.A. § 2503(b).

In addition to a claim of "perfect" self-defense, which would, if successful, result in complete acquittal, a defendant charged with first-degree murder may (as Appelland did here) alternatively claim that he committed an "unreasonable belief killing" as an act of "imperfect self-defense." *See* 18 Pa.C.S.A. § 2503(b). "A person who intentionally or knowingly kills an

- 11 -

individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable." *Id*.

"The derivative and lesser defense of imperfect belief self-defense is imperfect in only one respect – an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter." ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124 (Pa. 2012) (internal citations and quotations omitted).

Here, as discussed above, the Commonwealth presented evidence that Appellant had an unreasonable fear of death or serious bodily injury. Although Appellant testified that the victim possessed a weapon, this testimony was uncorroborated by any other evidence. In fact, the surveillance video of the incident partly established that he was unarmed because it does not show the victim possessing a weapon. The victim did not have a gun on his person when he was found, and no weapon was found in the surrounding area. Appellant's decision to flee the auto shop after the shooting – in a vehicle that did not belong to him, and after removing the vehicle's license plate – could further suggest that Appellant himself knew that his use of deadly force was not reasonable.

Viewing these facts in a light most favorable to the Commonwealth, the jury could have reasonably inferred that the victim did not have a weapon, and that Appellant unreasonably believed the victim posed a deadly threat. *See Commonwealth v. White*, 424 A.2d 1296, 1298 (Pa. 1981) ("Although the evidence against appellant was not uncontradicted, the jury weighed the testimony and this Court will not disturb its verdict: the Commonwealth's evidence was amply sufficient to support a verdict of voluntary manslaughter while disproving, beyond a reasonable doubt, appellant's claim of self-defense.").

Appellant's third and final claim on appeal is that the trial court erred in denying a missing witness instruction as to Leon Booker, the owner of the auto shop where Appellant worked, and where the victim was shot.

At the outset, we note that this claim is waived for lack of a timely objection. It is well-settled that a "specific and timely objection must be made to preserve [a] challenge to [a] particular jury instruction[, and] failure to do so results in waiver[.]" *Commonwealth v. Forbes*, 867 A.2d 1268, 1274 (Pa. Super. 2005) (citation omitted); *see also See also Commonwealth v. Pressley*, 887 A.2d 220, 224 (Pa. 2005)("The pertinent rules [of Criminal Procedure] . . . require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction. "). "No portions of the charge nor omissions from the charge

may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." Pa.R.Crim.P. 647(C).

In the case at hand, Appellant timely requested a missing witness instruction as to Booker, contending that the witness had given a material statement to investigating officers, and that the Commonwealth did not attempt to produce him at trial despite being more available to the Commonwealth than to Appellant. Appellant argued that Booker would have testified that the victim was extremely angry and hostile during his fatal encounter with Appellant; the witness could also have corroborated what Appellant told him during the phone call with him about an hour after the shooting took place.

The trial court specifically denied a missing witness instruction as to Booker when it was requested. *See* N.T. Hearing, 5/15/2024, at 9 ("That's respectfully denied."). However, just prior to deliberations, after the trial court read the instructions to the jury, the parties were prompted to voice any concerns with the jury charges as given, and Appellant, through his counsel, voiced satisfaction with them. *See* N.T. Trial, 5/15/2024, at 77. Thus, Appellant did not preserve his present claim regarding the denial of the instruction for purposes of appellate review. *See id*.

Even if Appellant had preserved his jury instruction claim, we would find that it lacks merit. The denial of a jury instruction request is subject to an abuse of discretion standard of review. *See  Commonwealth v. Galvin*, 985

- 14 -

A.2d 783, 798-99 (Pa. 2009). A missing witness instruction may be read to the jury "when a potential witness is available to only one of the parties at trial, it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative." **Commonwealth v. Jones**, 323 A.3d 13, 21 (Pa. Super. 2024) (quoting **Commonwealth v. Miller**, 172 A.3d 632, 645 (Pa. Super. 2017)). The instruction advises the jury that it may draw an adverse inference against the party who has failed to produce the testimony of the unavailable witness. **See Commonwealth v. Manigault**, 462 A.2d 239, 241 (Pa. 1983) (internal citations and quotation marks omitted).

A witness is considered available only to one party if the witness is "peculiarly within the knowledge and reach" of only one party. **Commonwealth v. Evans**, 664 A.2d 570, 574 (Pa. Super. 1995). A witness whose identity has been disclosed to the opposing party is considered available to both parties. **See Commonwealth v. Culmer**, 604 A.2d 1090, 1098 (Pa. Super. 1992) ([Alleged missing witness], on the other hand, was available to both parties, since her identity was made known to appellant.").

A witness is considered available to both parties when both are aware of the witness's identity. **See id**.; **see also Commonwealth v. Boyle**, 733 A.2d 633, 639 (Pa. Super 1999). A missing witness instruction is not warranted where the testimony of the witness would be cumulative of other

evidence admitted at trial. *See Commonwealth v. Berry*, 513 A.2d 410, 414-15 (Pa. Super. 1986).

In the present case, the missing witness instruction was properly denied because Booker was not peculiarly within the knowledge and reach of the Commonwealth, and he did not possess any special information material to a trial issue. Appellant had a personal relationship with Booker, but he did not contact or subpoena him at his home to testify.[1] The record shows that both Appellant and the Commonwealth had equal access to Booker because both parties knew his identity and had subpoena power as to that witness.

Appellant has argued that the Commonwealth had greater access to Booker because, about two to three months prior to the trial, a detective told Booker he would not be needed as a trial witness, and he could go on vacation. *See* N.T. Trial, 5/14/2024, at 81-82.[2] Regardless of that communication, the record shows that Appellant remained in contact with Booker for months after the detective told Booker he would not be called (by the Commonwealth) as a trial witness. Further, the detective logically could only have been speaking

_____

[1] The defense unsuccessfully attempted to subpoena Booker at his place of work.

[2] Defense counsel called Britchett Meekins, Appellant's father, to testify as to his efforts in making contact with Booker. Meekins testified that he tried contacting Booker about 15 to 20 times, and was only able to contact him on the day of trial. *See* N.T. Trial, 5/14/2024, at 149. Meekins testified that Booker informed him he would not be coming to court because the "DA didn't need him to come to Court to be present. So, he just – he planned a vacation." *Id*., at 150.

- 16 -

as to the prosecution's intent to call him as a witness, not to Appellant's trial strategy.

Indeed, defense counsel stated on the record that Booker had been in regular contact until about three weeks before trial, at which point Booker stopped taking defense counsel's calls. *See* N.T. 5/14/2025, at 154. Thus, the Commonwealth's communications with Booker in no way reduced the availability of that witness to Appellant; nor did it increase the Commonwealth's access to the witness at the expense of Appellant.

Even if Booker was more available to the Commonwealth than to Appellant, the trial court still did not abuse its discretion in denying a missing witness instruction because Booker's testimony would have been both cumulative and not germane to a material trial issue. Booker was not an eye-witness to the shooting. The content of Booker's account was largely undisputed by the Commonwealth – Appellant and the victim were involved in a heated argument about damage to the victim's vehicle. Those same facts were established by the surveillance video footage and Appellant's own testimony. The Commonwealth presumed the truth of Appellant's testimony about his phone call with Booker in order to impeach him, so corroboration of what the two men discussed would have been cumulative. Thus, no relief is due on Appellant's jury instruction claim. Appellant's judgment of sentence must be upheld.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/26/2026